**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**Patricia B. RUSCONI and Angelo Rusconi, Defendants and Counterclaim Plaintiffs.**

Civ. No. 91–0043–P–C.

United States District Court, D. Maine.

May 28, 1992.

Vacated Oct. 21, 1992.*

* Editor's Note: The court's order on reconsideration filed Oct. 21, 1992 is published in a subsequent volume.

Mary Ann E. Rousseau, Friedman & Babcock, Portland, Me., for plaintiff.

William K. McKinley, Richardson & Troubh, Portland, Me., for defendants.

## ORDER GRANTING PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

This case arose out of Plaintiff Federal Deposit Insurance Corporation ("FDIC")[1] seeking foreclosure of realty owned by Patricia and Angelo Rusconi ("Defendants"), which was provided as collateral for a note dated October 2, 1987 ("First Note"), in the principal amount of $150,000. Defendants had executed, acknowledged, and delivered to BNE a Mortgage and Security Agreement ("Mortgage") covering personal realty located at Lake Thompson, Maine. Plaintiff seeks foreclosure of the Mortgage and sale of the realty in accordance with 14 M.R.S.A. section 6322 *et seq.*

Plaintiff also seeks to enforce the personal guaranties of the four promissory notes signed by Ms. Rusconi, including the First Note, which Defendants signed on October 2, 1987 on behalf of Gilfenbain Brothers, Inc. ("GBI").

Defendants have raised over seventeen affirmative defenses to Plaintiff's claims and have also counterclaimed against Plaintiff in seven separate counts, including fraud, unfair and deceptive practices, breach of implied covenant of good faith, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and punitive damages.

The Court now has before it Plaintiff's Motion for Partial Summary Judgment, filed on March 9, 1992. The Court acts on

---

1. Bank of New England, N.A. ("BNE") originally brought the Complaint commencing this action in the Superior Court in and for the County of Oxford and State of Maine on May 31, 1990. Prior to January 6, 1991, BNE was a national banking association doing business in the Commonwealth of Massachusetts. On that date, the Comptroller of the Currency of the United States of America, acting pursuant to 12 U.S.C. section 191, found BNE to be insolvent and thereupon appointed the FDIC as receiver of BNE pursuant to 12 U.S.C. section 1821(c)(2). As Receiver, the FDIC succeeded to all rights, titles, powers, and privileges of BNE.

The FDIC caused a so-called "bridge bank" entitled New Bank of New England ("NBNE") to be chartered to provide BNE banking services on a continuing basis. On July 11, 1991, this entity was dissolved by the FDIC.

The FDIC removed this case to this Court on February 5, 1991, pursuant to 12 U.S.C. section 1819(b)(2)(B), in its capacity as Receiver of BNE. The counterclaim in this action is an original liability of BNE, which passed to the FDIC in its capacity as Receiver. It was not transferred to NBNE. The FDIC as Receiver is, therefore, by operation of law, the present entity exposed to liability on the counterclaim.

FDIC has been substituted for BNE as Plaintiff and Counterclaim Defendant in this matter.

this Motion on the basis of the written submissions of the parties.[2]

## I. *Summary Judgment*

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court of Appeals for the First Circuit has articulated the legal standard to be applied in deciding motions for summary judgment:

[T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 [106 S.Ct. 2548, 2554, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]; *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988). It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be entered.

*Anderson,* 477 U.S. at 249–59 [106 S.Ct. at 2510–16].

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989).

The Court now looks to the supporting papers on the motion and the citations to materials of evidentiary quality in support of the issues which the Court must consider as a basis for its action upon the motion.

## II. *Facts*

The Court finds the following facts to be undisputed on the record made on the motion.

The FDIC is the holder of four promissory notes dated October 1987,[3] November 22, 1988, December 14, 1988, and May 12, 1989, executed by Patricia Rusconi, in the principal amounts of $150,000, $100,000, $120,000, and $49,900, respectively.[4] These

---

**2.** The Court, in its discretion under Rule 19(f) of the Rules of the United States District Court for the District of Maine, DENIES Plaintiff's counsel's request, filed April 15, 1992, for oral argument on its Motion for Summary Judgment.

**3.** The First Note does not provide a specific date other than "October, 1987."

**4.** With respect to the First Note, Ms. Rusconi states that the term "President" was not on the Note and Mortgage when she signed it on October 2, 1987. She alleges that the word "President" was added to the right of Ms. Rusconi's typed name below her signature. "If the term President was on the documents I would have questioned it because I did not consider myself the President of Gilfenbain Brothers, Inc., at that time." Affidavit of Defendant Patricia B.

Rusconi in Opposition to Motion for Summary Judgment Filed by the FDIC, ¶ 50, at 16 ("P. Rusconi Affidavit").

The Court finds that whether or not the term "President" was on the First Note and Mortgage when Ms. Rusconi signed it, her liability under the Note is unaffected in light of the Guaranty that she signed on the same date. The record contains no evidence that the Guaranties themselves were altered.

With respect to the Second and Third Notes, Ms. Rusconi executed the Notes on behalf of Gilfenbain in her capacity as President and Treasurer. She also endorsed the back of each of these two Notes.

With respect to the Fourth Note, she executed the Note on behalf of Gilfenbain in her capacity as President.

four Notes are in default by virtue of Defendants' failure to pay when due and owing within any applicable grace period the monthly installments required by the First Note and failure to pay on demand the Second, Third, and Fourth Notes, which are payable on demand.[5]

On October 2, 1987, Defendants executed and delivered to Plaintiff unconditional guaranties of all the obligations owed to Plaintiff by GBI, pursuant to which each Defendant guaranteed payment of all sums then due and owing and "all sums which shall in the future become due and owing...." to Plaintiff from GBI.[6]

In order to secure the Guaranties entered on October 2, 1987, by Defendants and to secure the First Note in the amount of $150,000, Defendants executed and delivered to Plaintiff a Mortgage in favor of Plaintiff.

On December 31, 1988, Ms. Rusconi, on behalf of GBI, tendered full payment under the First Note to BNE. She sent a letter with the check to BNE and requested that the Bank, through Janet Maher, cash the check and discharge the First Note. The Bank did not cash the check. Thereafter, within a week or two, Ms. Rusconi spoke with Ralph DiGiacomo of BNE who indicated that the Bank would not accept the prepayment.

### III. *Discussion*

#### A.

■ Under Count I, pursuant to Maine law, the Court shall determine (1) whether Defendants have breached a condition of the mortgage; (2) the amount due thereon including reasonable attorneys' fees and court costs; and (3) the order of priority and the amount due, if any, to other parties that may appear. 14 M.R.S.A. § 6322 (Supp.1990). The Court concludes that no genuine issue of material fact exists as to any of these elements under Maine law.

■ First, the Mortgage was given to secure the First Note and Guaranties and it provides as follows:

the Guaranty of the Mortgagor to the Mortgagee in the sum of ... $150,000, which Guaranty is of even date, and also to secure the performance of all agreements herein contained and contained in a Note ... of even date of Gilfenbain[ ] to the Mortgagee....

It further provides:

It is also agreed that this Mortgage is security for the payment of the aforesaid

---

5. As of January 31, 1992, the amount due to Plaintiff under the terms of each Note was as follows:

For the First Note, unpaid principal balance of $65,000 and accrued interest of $21,398.53, for a total amount due of $86,398.53. Interest is continuing to accrue on the principal balance at a daily rate of $14.14.

For the Second Note dated November 22, 1988, unpaid principal balance of $100,000 and accrued interest of $30,748.62, for a total amount due of $130,748.62. Interest is continuing to accrue on the principal balance at a daily rate of $20.83.

For the Third Note dated December 14, 1988, unpaid principal balance of $120,000 and accrued interest of $37,231.66, for a total amount due of $157,231.66. Interest is continuing to accrue on the principal balance at a daily rate of $25.00.

For the Fourth Note dated May 12, 1989, unpaid principal balance of $49,900 and accrued interest of $14,444.24, for a total amount due of $64,377.24. Interest is continuing to accrue on the principal balance at a daily rate of $10.40.

For all four Notes, Defendants are also liable to Plaintiff for its additional costs of enforce-ment and collection, including reasonable attorneys' fees.

6. Defendants dispute Plaintiff's reading of the Guaranties. They argue that they had an agreement with the BNE that their liability would be limited to the $150,000 First Note. Specifically, they assert that Patricia Rusconi had several conversations with Janet Maher of BNE, prior to and at the closing, during which Ms. Maher assured Mrs. Rusconi that she and her husband would have no liability beyond the $150,000 First Note. *See* Statement of Material Facts in Dispute as to Which There are Genuine Issues to be Tried in Support of Defendants' Objection to Plaintiff's Motion for Summary Judgment ("Defendants' Statement"), ¶¶ 3–5, at 2. Moreover, they argue that they did not know that they were signing Guaranties and never intended to do so.

Although the dispute over the nature of the Guaranties presents a genuine issue of material fact, the Court, as noted below, finds, first, that the Guaranties are unambiguous as a matter of law. Second, any alleged oral agreements regarding the meaning of the Guaranties are precluded from consideration as a matter of law, based upon the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) ("section 1823(e)").

obligations and all other direct and contingent liabilities of the Mortgagor hereof to the holder hereof due or to become due whether now existing or hereafter contracted.

Plaintiff [FDIC]'s Statement of Material Facts as to Which There is no Genuine Issue to be Tried ("Plaintiff's Statement"), Exhibit G.

The Court finds that the Mortgage secures the Guaranties and the First Note in the amount of $150,000. The Court further finds that this Note is in default because Defendants failed to pay the monthly installments when due and owing.[7] The Court concludes that no genuine issue of material fact exists as to whether Defendants are in default under the First Note. As a result, Defendants breached a condition of the Mortgage.

Second, Defendants have failed to make the required payments of the principal and accrued interest due under the Note.[8]

Last, with respect to the order of priority, and the amount due to other parties, no other parties that appear claim any interest in the realty in question.

The Court finds that Plaintiff has satisfied the aforementioned elements under Maine law and has established its affirmative case for foreclosure under Count I of its Complaint.

### B.

Under Count II, Plaintiff alleges that Defendants are in default of their Guaranties to pay all sums due and owing under the four Notes. The parties dispute the proper interpretation of the Guaranties signed by Defendants. Plaintiff alleges that Defendants guaranteed all sums then due and owing and "all sums which shall in the future become due and owing" to the Plaintiff from GBI. Plaintiff argues that the parties intended the personal Guaranties to remain effective for all of the loan obligations of GBI, including the four Notes. Plaintiff's Memorandum at 10–11.

Defendants first argue that they signed the Guaranties unknowingly because Plaintiff never mentioned such Guaranties to them prior to or during the closing. Further, they argue, based on alleged oral communications, that the Guaranties were meant to apply only to the First Note, but not to any other subsequent notes or debt obligations of GBI.[9] Although they admit that the Guaranties are "simple and straightforward," they argue that the guaranties must be read together with the Mortgage and Notes as part of one transaction. Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendants' Memorandum") at 6. When the documents are read together, Defendants argue that the Guaranties are ambiguous. They conclude that because the instruments that Plaintiff seeks to enforce, including the Guaranties, are ambiguous, "their content must be determined upon testimony by the trier of fact." *Id.*

The issue of whether contract language is ambiguous is a question of law

**7.** Defendants deny that they have failed to pay the amounts due under the First Note because they tendered payment to pay the balance of the First Note but BNE refused such tender. As the Court discusses below, however, it finds that BNE had the right to deny such prepayment of the First Note.

**8.** For a breakdown of the amounts due and owing on each Note, see *supra* note 5.

**9.** In a Fifth Circuit Court of Appeals case, the defendants similarly argued that the guaranties extended and applied only to one transaction and not to other transactions with the bank. See *FDIC v. Cardinal Oil Well Servicing Co.,* 837 F.2d 1369, 1371 (5th Cir.1988). The court responded:

The guaranty agreements ... apply to "any and all existing and future indebtedness and liability of any kind ... from [defendant] to the Bank ... howsoever and whensoever created, or advised, or evidenced, or acquired."

.  .  .  .  .

Examining the language of the agreements we find nothing to indicate that the guaranty was limited to a single note transaction. Nor is there any language excluding the guaranty of an obligation of the corporation, made to another party and subsequently assigned to the bank.... The guarantors are liable under the express terms of the agreements they signed. *Id.*

under Massachusetts law.[10] *See Boston Five Cents Savings Bank v. Secretary of Department of Housing and Urban Development*, 768 F.2d 5, 8 (1st Cir.1985).[11] Moreover, the interpretation of an unambiguous written document is a question of law for the Court under Massachusetts law. *See Monadnock Display Fireworks, Inc. v. Andover*, 388 Mass. 153, 157, 445 N.E.2d 1053 (1983). Under Massachusetts law, only when several documents evidence a single contract are the instruments read together in order to arrive at an interpretation of that contract. *See Harding v. Broadway National Bank*, 294 Mass. 13, 19–20, 200 N.E. 386 (1936).

Here, in light of the aforementioned Massachusetts law, the Court finds as a matter of law that the Guaranties, Mortgage, and Notes are separate contracts and further finds as a matter of law that they are not ambiguous in any relevant respect.[12] In the absence of any ambiguity, the Court will not allow any extrinsic evidence by Defendants to vary the terms of the unambiguous Guaranties. *See FDIC v. P.L.M. International, Inc.*, 834 F.2d 248, 253 (1st Cir.1987) ("Here [defendant] seeks to limit the contour of the asset as described in the [document] ... by asserting that an ambiguity exists in the [documents]. Then [defendant] seeks to resolve the ambiguity it created ... by resorting to evidence not meeting Sec. 1823(e)'s requirements.") (quoting *FDIC v. Merchants National Bank of Mobile*, 725 F.2d 634, 639 (11th Cir.), *cert. denied*, 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984)).

Therefore, the Court finds that Plaintiff has established its affirmative case for Defendants' liability based on the Guaranties under Count II of its Complaint.

---

**10.** The documents in this case, including the four Notes and the Guaranties, contain a choice-of-law provision that indicates that they are governed by the law of the Commonwealth of Massachusetts. The Court will accept this provision as controlling the present case. *See, e.g., D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 474, 62 S.Ct. 676, 687, 86 L.Ed. 956 (1942) (Jackson, J., concurring) ("[M]any questions as to the liability of parties to commercial paper which comes into the hands of the [FDIC] will best be solved by applying the local law with reference to which the [parties] presumably contracted."); *FDIC v. Bank of America National Trust & Savings Association*, 701 F.2d 831, 834 (9th Cir.) ("[P]arties may agree as to the law to be applied to their contract."), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983); *In Re: Amica, Inc.*, 135 B.R. 534, 545 (N.D.Ill.1992) ("Parties to a contract can control choice of law by including in their Agreement an express provision as to which state law should govern.") (citing Robert A. Leflar, *American Conflicts Law*, § 147 (1977)).

**11.** In *Boston Five Cents Savings Bank*, the First Circuit Court of Appeals noted the following:

In our opinion, an argument between parties about the meaning of a contract is typically an argument about a "material fact," namely, the factual meaning of the contract. But, sometimes this type of argument raises "no genuine issue." The words of a contract may be so clear themselves that reasonable people could not differ over their meaning. Then, the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ. Courts, noting that the judge, not the jury, decides such a threshold matter, have sometimes referred to this initial question of language ambiguity as a question of "law," which we see as another way of saying that there is no "genuine" factual issue left for a jury to decide.

768 F.2d at 8 (citation omitted).

**12.** The Guaranties, for example, plainly state as follows:

To induce you to make or continue to make advances, or grant other financial accommodations to Gilfenbain Bros. Co. (hereinafter called the "Borrower"), whether pursuant to a Security Agreement or otherwise, and in consideration thereof and for loans, advances or financial accommodations heretofore or hereafter granted by you to or for the account of the Borrower, whether pursuant to said Security agreement, if any, or otherwise, *each of the undersigned Guarantors guarantees the payment to you of all sums which may be presently due and owing and of all sums which shall in the future become due and owing to you from Borrower*, whether under said Security Agreement or any other agreement or otherwise; and also *guarantees the due performance by the Borrower of all its obligations under said Security Agreement and under all other present and future contracts and agreements with you.*

Plaintiff's Statement, Exhibits E–F (emphasis added).

The Mortgage provides security in the amount of $150,000. *See id.*, Exhibit G.

## C.

Defendants raise numerous affirmative defenses to both Counts I and II. Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989), codified in scattered sections of 12 U.S.C. 1811 *et seq.* (Supp. II 1990), this Court's subject matter jurisdiction over claims against FDIC as receiver, or against failed banks for which FDIC is liable, is governed in part by both 12 U.S.C. section 1821(d)(13)(D) and 12 U.S.C. section 1821(d)(6)(A). The Court must take note of its lack of subject matter jurisdiction whenever it appears, whether or not the parties have done so. The Court's lack of subject matter jurisdiction over the affirmative defenses in this case now appears to the Court, *sua sponte,* for the first time. Here, the Court has no subject matter jurisdiction over Defendants' affirmative defenses, first, because of the carefully delineated language of 12 U.S.C. section 1821(d)(13)(D), which states in pertinent part:

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or

(ii) any claim relating to any act or omission of such institution or the corporation as receiver.

The Court finds that this subsection of FIRREA, which the Court has applied to claims and counterclaims asserted against the FDIC, also applies to affirmative defenses raised against the FDIC. *See, e.g., FSLIC v. Shelton,* 789 F.Supp. 1367, 1371 (D.La.1992) ("[T]he plain language of 12 U.S.C. § 1821(d)(13)(D) supports and requires this Court's finding that it has no subject matter jurisdiction over the affirmative defenses at issue in this motion.... Since the claims against the former directors and officers are assets of the failed Sun Belt bank, the Court finds that the affirmative defenses asserted by the defendants seek a 'determination of rights with respect' to Sun Belt thereby triggering the jurisdictional exclusion of the statute."). *Cf. Resolution Trust Corp. v. Shoreview Builders, Inc.,* 252 N.J.Super. 408, 599 A.2d 1291 (N.J.Super.Ct.App.Div.1991) ("The RTC's motion to dismiss was addressed only to defendants' counterclaim. It did not seek to strike defendants' affirmative defenses, such as equitable fraud and estoppel. During oral argument before us, counsel for the RTC conceded that FIRREA would not bar such affirmative defenses. In view of that concession, we do not address the issue."). The Court finds that Defendants' affirmative defenses clearly relate to "act[s] or omission[s]," *see* 12 U.S.C. section 1821(d)(13)(D)(ii), of the "depository institution for which the [FDIC] has been appointed receiver," *see id.* section 1821(d)(13)(D)(i).

Defendants' affirmative defenses therefore are subject to the jurisdictional exclusions of FIRREA, including 12 U.S.C. section 1821(d)(6)(A), which states in pertinent part:

[T]he claimant may [after exhaustion of FIRREA's administrative claims review procedures] ... file suit on such claim ... in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia.

BNE had its principal place of business in Massachusetts, not Maine. *See* Notice of Removal to United States District Court, ¶ 1. Therefore, the Court has no jurisdiction over Defendants' affirmative defenses nor can *this Court* acquire jurisdiction over them in future. However, in the interest of providing a complete record for dispositive appellate review, the Court will address the issues generated by Defendants' affirmative defenses on this Motion for Summary Judgment as it would if persuaded that it had subject matter jurisdiction over such defenses.

## D.

For the reasons that follow, the Court, if acting with subject matter jurisdiction, would find that, first, certain of those defenses would be barred as a matter of law under the *D'Oench Duhme* doctrine and section 1823(e); that, second, other defenses also would fail as a matter of law because they are legally insufficient based on the record evidence; and that, last, the defense based on fraud in the factum would present genuine issues of material fact that would preclude summary judgment.[13]

### i.

The *D'Oench, Duhme* doctrine, a federal common law estoppel doctrine, prohibits borrowers or guarantors from using secret or unrecorded side agreements to defend against efforts by the FDIC or its assignees to collect on promissory notes that it has acquired from a failed bank. *See D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 460, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942). This Court has invoked the doctrine in granting summary judgment in favor of the FDIC or its assignees to prohibit makers or guarantors of facially unqualified notes from using oral agreements and representations to defend against efforts by the FDIC or its assignees to collect on such notes. *See, e.g., Fleet Bank of Maine v. Steeves,* 785 F.Supp. 209 (D.Me. 1992); *Fleet Bank of Maine v. Wilson,* 780 F.Supp. 841, 846 (D.Me.1991); *New Maine National Bank v. Benner,* 774 F.Supp. 36, 40 (D.Me.1991); *Bateman,* 766 F.Supp. at 1199; *Seydler,* 765 F.Supp. at 773–74.

The *D'Oench, Duhme* doctrine is no longer strictly common law. Section 13(e) of the Federal Deposit Insurance Act of 1950 and section 214(a) of FIRREA both incorporated and clarified the doctrine. *See* 12 U.S.C. §§ 1821(n)(4)(I), 1823(e).[14] Courts have interpreted section 1823(e) as precluding affirmative defenses of obligors on obligations that were previously assigned to the insolvent bank and subsequently assumed by the FDIC or its assignees. *See, e.g., Wilson,* 780 F.Supp. at 846 ("[The doctrine's] codified statutory provisions estop Defendant from asserting the

**13.** Defendants have not offered any argument or evidence in support of certain affirmative defenses, namely, failure of consideration, laches, *res judicata,* statute of frauds, fair and deceptive practices, or release. Defendants cannot preclude the Court from waiving those affirmative defenses simply by asserting that, even though they do not elaborate on or argue such defenses, they preserve these defenses. *See* Defendants' Memorandum at 3 n. 1. As the First Circuit Court of Appeals noted: "It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Collins v. Marina–Martinez,* 894 F.2d 474, 481 n. 9 (1st Cir.1990). Accordingly, the Court, if acting with subject matter jurisdiction, would consider these defenses to have been waived. *See Bateman v. FDIC,* 766 F.Supp. 1194, 1200 n. 7 (D.Me.1991); *New Maine National Bank v. Seydler,* 765 F.Supp. 770, 773 n. 4 (D.Me.1991). *See also Carey on behalf of Carey v. Maine School Administrative District # 17,* 754 F.Supp. 906, 924 (D.Me.1990).

**14.** Under section 1823(e):

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section, or Section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement

1) is in writing;

2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution;

3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee; and

4) has been, continuously, from the time of its execution, an official record of the depository institution.

Agreements not meeting all four requirements set forth under the statute are unenforceable against the FDIC. *See FDIC v. Rivera–Arroyo,* 907 F.2d 1233, 1236 (1st Cir.1990).

The United States Supreme Court gave a very broad definition to the "agreements" that must meet the four requirements of section 1823(e):

Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of warranted fact.

*Langley v. FDIC,* 484 U.S. 86, 92–93, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987).

only defenses that she has raised against Plaintiff's Complaint."). The Court of Appeals for the First Circuit has extended the application of section 1823(e) to guaranties. *See P.L.M. International*, 834 F.2d at 254. *See also FDIC v. Virginia Crossings Partnership*, 909 F.2d 306, 312 (8th Cir.1990); *FDIC v. Galloway*, 856 F.2d 112, 116 (10th Cir.1988).

The Court, if acting with subject matter jurisdiction, would conclude that the *D'Oench Duhme* doctrine and its codification under section 1823(e) precludes Defendants from raising certain affirmative defenses that are predicated upon the existence of alleged oral agreements or representations;[15] namely, estoppel,[16] waiver,[17] and fraud.[18] Here, as the factual predicate to the aforementioned affirmative defenses, Defendants assert that they had an oral agreement with BNE that their liability would be limited to the $150,000 Mortgage and First Note. *See* Statement of Material Facts in Dispute as to Which There are Genuine Issues to be Tried in Support of Defendants' Objection to Plaintiff's Motion for Summary Judgment ("Defendants' Statement"), ¶ 3–6, at 2. This alleged misrepresentation, which is not evidenced in any manner in the records before the Court, forms the basis for these defenses. The Court, if acting with subject matter jurisdiction, would need go no further than the requirement of a writing to find that these affirmative defenses would be barred as a matter of law under the *D'Oench, Duhme* doctrine and section 1823(e) and, therefore, such defenses would present no genuine issue of material fact.[19]

**15.** Defendants contend that the FDIC must first establish itself as a holder-in-due-course before the *D'Oench, Duhme* doctrine and section 1823(e) may be invoked where non-negotiable instruments are involved. *See* Defendants' Memorandum at 15–24. Defendants have wrongly construed the doctrine and misinterpreted their cited authority. The Court wholly disagrees with such mischaracterization because the FDIC need not establish itself as a holder-in-due-course as a requisite to invoking the protections of *D'Oench, Duhme* and section 1823(e). *See, e.g., FDIC v. Aetna Casualty & Surety Co.*, 947 F.2d 196, 205 n. 9 (6th Cir.1991) ("We are not holding that section 1823(e) is applicable only to negotiable instruments. In fact, our circuit and others have either implicitly, explicitly, or unknowingly rejected this distinction."); *P.L.M. International*, 834 F.2d at 254–55 ("This necessity for speed has led the majority of courts of appeals to reject the idea of treating negotiable and nonnegotiable instruments differently.... We ... hold that section 1823(e) covers nonnegotiable as well as negotiable instruments.").

**16.** *See, e.g., Bateman*, 766 F.Supp. at 1200 n. 7.

**17.** *See, e.g., Fleet Bank v. Matthews*, 795 F.Supp. 492, 496 (D.Me.1992); *FDIC v. Caledonia Investment Corp.*, 862 F.2d 378, 383 (1st Cir.1988); *Bateman*, 766 F.Supp. at 1200 n. 7.

**18.** Although Defendants raise "fraud" as a general affirmative defense, the Court will address two specific types of fraud: fraud in the inducement and fraud in the factum. Fraud in the inducement is "[f]raud connected with [the] underlying transaction and not with the nature of the contract or document signed." Black's Law Dictionary 595 (5th ed. 1979). This sort of fraud renders a note voidable but not void and, hence, it is barred by *D'Oench, Duhme* and section 1823(e). *See, e.g., Langley*, 484 U.S. at 94, 108 S.Ct. at 402 (dicta); *Virginia Crossings Partnership*, 909 F.2d at 310 ("[Defendants], in order to vary the terms of the loan agreement, are attempting to assert side agreements and understandings with the Bank that do not comply with the stringent requirements of § 1823(e).... [T]he defense of fraud in the inducement is unavailing...."). *See also Wilson*, 780 F.Supp. at 845 (fraudulent misrepresentation); *Seydler*, 765 F.Supp. at 774 (fraudulent misrepresentation).

The Court will address fraud in the factum in the next section of the text.

**19.** In addition to the aforementioned affirmative defenses, Defendants also assert that the Guaranties were terminated when Ms. Rusconi had certain oral conversations with BNE officials. *See* P. Rusconi Affidavit, ¶ 44. Such oral communications are barred by the doctrine and section 1823(e) and, hence, the Court cannot rely on such communications to conclude that these Guaranties have been terminated.

Even in the absence of the doctrine and section 1823(e), the Guaranties explicitly state that they may be terminated as to any Guarantor "only by giving [BNE] sixty days prior written notice by registered or certified mail ..." Plaintiffs Statement, Exhibits E–F. Although Defendants assert that written notice of the termination of the Guaranties exists in Plaintiff's files, they concede that they did not comply with the notice requirements of the Guaranties:

The Plaintiff, will, undoubtedly, argue that Defendants did not meet the technical re-

*ii.*

Defendants raise other affirmative defenses that are not necessarily barred by the *D'Oench, Duhme* doctrine; namely, fraud in the factum, *see, e.g., Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402–03; *FDIC v. Caporale,* 931 F.2d 1, 2–3 n. 1 (1st Cir. 1991); duress, *see, e.g., Resolution Trust Corp. v. Ruggiero,* 756 F.Supp. 1092, 1095 & n. 5 (N.D.Ill.1991), and tender of payment. For the reasons that follow, the Court, if acting with subject matter jurisdiction, would find on the motion record here made that fraud in the factum would present genuine issues of material fact whereas the other affirmative defenses would be barred as a matter of law because they are legally insufficient.

With respect to Defendants' affirmative defense of fraud, which the Court will address in terms of fraud in the factum, such fraud is "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents." *Langley,* 484 U.S. at 93, 108 S.Ct. at 402. This sort of fraud "would render the instrument entirely void," *id.,* and arises in a situation such as:

> that of the maker who is tricked into signing a note in the belief that it is merely a receipt or some other document. The theory of the defense is that his signature on the instrument is ineffective because he did not intend to sign such an instrument at all.

*See* U.C.C. § 3–305, Official Comment 7.

■■■■■ To establish fraud in the factum, defendants "must have shown not only that they were induced to sign ... documents by the Bank's misrepresentations without knowledge of their character or essential terms, but also that they had no reasonable opportunity to obtain such knowledge." *Virginia Crossings Partnership,* 909 F.2d at 311. Thus, first, Defendants must show that the Bank made a

misrepresentation regarding the document in question. *See, e.g., Virginia Crossings Partnership,* 909 F.2d at 310 ("[Defendants] alleged that, although [the bank] knew they were relying on the terms outlined in the ... memoranda and [it] knew that the terms of the ... documents differed materially from the agreed upon terms, [the bank] remained silent about the difference when presenting the documents for their signatures."); *FDIC v. Turner,* 869 F.2d 270, 274 (6th Cir.1989) ("[Bank] induced [defendant] into signing a guaranty based on misrepresentations concerning the principle maker and the holding bank. This is not merely a case of an incomplete guaranty being fraudulently completed. [Bank] erased the original bank's name and inserted the name of another bank."). Second, Defendants must show that they signed the instrument without knowledge of its essential terms. Last, Defendants must show that they did not have a reasonable opportunity to obtain knowledge of the true nature of the instrument. In determining whether a party had a "reasonable opportunity," courts consider all relevant factors, including age, intelligence, education and business experience, ability to read and to understand English, reason to rely on the representations or to have confidence in the party making them, and the apparent necessity for acting swiftly. *See Virginia Crossings Partnership,* 909 F.2d at 311; *Turner,* 869 F.2d at 273.

■■■■ Here, the Court, if acting with subject matter jurisdiction, would find that genuine issues of material fact exist on the record regarding fraud in the factum, those issues including, *inter alia,* whether Plaintiff made misrepresentations to Defendants regarding the loan documents, including the Guaranties and Notes; and whether Defendants were denied a "reasonable opportunity" to examine the contents of the Guaranties before signing them or within a

quirements found in the language of the Guarantees themselves for their termination. While this true [sic], Defendants would point out that these are merely technical requirements and substance should rule over form on important questions of justice. Defendants' Memorandum at 25.

Defendants argue that they could not have complied with such requirements because they did not receive copies of the Guaranties until two years after their signing the documents. *Id.* The Court finds that regardless of whether Defendants had copies of the Guaranties, such Guaranties were not terminated.

reasonable time thereafter. Therefore, Defendants' affirmative defense of fraud in the factum would preclude the granting of summary judgment on behalf of Plaintiff under Counts I and II.

■ Similar to fraud in the factum, the affirmative defense of duress is not barred by the *D'Oench, Duhme* doctrine and section 1823(e). To the extent that such defense is based upon alleged oral agreements, however, it is barred. *See Oliver v. Resolution Trust Corp.,* 747 F.Supp. 1351, 1356 (E.D.Mo.1990). Moreover, the Court, if acting with subject matter jurisdiction, would find, independent of the doctrine, that Defendants have failed to establish a legally sufficient defense for duress.

Some jurisdictions have recognized economic duress as an affirmative defense to an action on a contract or note. *See, e.g., Ruggiero,* 756 F.Supp. at 1095 ("[T]he party raising [economic duress] as a defense to a suit on a note must show that the other party's demand was somehow unlawful...."); *FSLISC v. Ziegler,* 680 F.Supp. 235, 237 (E.D.La.1988) ("In order for duress to vitiate consent, the duress must be 'of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation.'") (quoting La.Civ.Code Ann. art. 1959); *FDIC v. Linn,* 671 F.Supp. 547, 556 (N.D.Ill.1987) ("Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will....") (quoting *Alexander v. Standard Oil Co.,* 97 Ill.App.3d 809, 814–15, 53 Ill.Dec. 194, 423 N.E.2d 578 (5th Dist.1981) (citation omitted)); [20] *FDIC v. Ramsey,* 612 F.Supp. 326, 328, 329 (E.D.Tenn.1985) ("The alleged coercive event must be of such severity, either threatened, impending or actually inflicted, so as to overcome the mind and will of a

person of ordinary firmness.... Defendant's subjective belief that he was under pressure to purchase the stock ... because of the timing of [bank president's] request is insufficient....").

Here, Defendants raise two incidences of alleged duress in this case, namely, that Defendants had great pressure to sign the documents, including the First Note and the Guaranty, at the closing, *see* Deposition of Patricia Rusconi, p. 41, l. 21–25; p. 42, l. 1–3; p. 82, l. 3–12, and that Ms. Rusconi was allegedly induced to sign the Fourth Note because she was told by Janet Maher that it was "career-threatening" for her if Ms. Rusconi failed to do so, *see id.,* p. 90, l. 3–13. The Court, if acting with subject matter jurisdiction, would find that, in either alleged incidence, no evidence exists that Defendants were "bereft of the quality of mind essential to the making of a contract." In this case, Defendants voluntarily went to BNE to sign the Notes and, similarly, they voluntarily signed the Notes and Guaranties. Ms. Rusconi admitted that she was not threatened if she refused to sign any of these documents. *See* Deposition of Patricia Rusconi, p. 230, l. 2–3, 9–10. Her subjective belief that she was pressured to sign the documents at issue is insufficient to state a legally sufficient claim for duress.[21] The Court, if acting with subject matter jurisdiction, would conclude that Defendants fail as a matter of law to establish the existence of a factual question on its affirmative defense of duress.

With respect to Defendants' affirmative defense that Plaintiff refused to accept a tender of payment made to Plaintiff, Defendant Patricia Rusconi alleges that she tendered to Plaintiff the entire balance due and owing on the First Note but that such payment was refused. *See* Defendants' Memorandum at 13–15. Furthermore, she asserts that she and her husband were

---

**20.** In *Linn,* the court noted that "to establish duress, one must demonstrate that the threat has left the individual 'bereft of the quality of mind essential to the making of a contract.'" 671 F.Supp. at 556.

**21.** As the *Linn* court noted, "Defendants cannot avoid the deficiencies in their legal theory mere-

ly by arguing the existence of economic duress is a factual question to be resolved by a jury. This Court can and must determine the existence or nonexistence of a factual question that can even get to a jury." 671 F.Supp. at 556 (citation omitted).

"repeatedly told that the First Note could be prepaid." *Id.* Defendants also argue that because the Note does not prohibit prepayment, there is an ambiguity in its language.

Plaintiff disputes any such ambiguity, noting that payment is to be made in a series of monthly installments. *See* Reply Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment at 2. The Note states in pertinent part:

> [T]he undersigned ... promises to pay to [BNE], or order, at said bank, the principal sum of [$150,000] in 36 installments as follows: $4,166.67 on November —, 1987, and the same amount (except the last instalment which shall be the unpaid balance) on the same day of each consecutive month thereafter until this note is fully paid....

Plaintiff's Statement, Exhibit A.

▇▇▇ The Court, if acting with subject matter jurisdiction, would find that the language of the First Note regarding the prepayment issue is unambiguous. The absence of a term, *i.e.*, prepayment provision, in a document does not render ambiguous that document. *See, e.g., Westminster Investing Corp. v. Equitable Assurance Society*, 443 F.2d 653, 657 (D.C.Cir.1970) ("[W]e find no ambiguity here. The written agreement between the parties is very clear in providing for prepayment of the 'whole of the principal balance' on 'any regular quarterly installment due date' and in not providing for prepayment at any other time. It is thus not a case of ambiguity, but the complete absence of any provision for prepayment between specified regular payment dates."). In essence, no right of prepayment is provided for under the First Note.[22]

▇▇▇ The Court, if acting with subject matter jurisdiction, would find that the BNE was entitled as a matter of law to refuse any and all prepayments tendered before the monthly due dates. *See Westminster Investing Corp.*, 443 F.2d at 657 n. 5 (and cases cited therein); *Trahant v. Perry*, 253 Mass. 486, 489, 149 N.E. 149 (1925) ("The time of payment in a note is a condition for the benefit of all parties to it, and a debtor cannot by tender compel the holder to accept payment of an instalment before it is payable, or of the full sum to be ultimately paid, before the maturity of the several obligations."). Accordingly, Defendants' affirmative defense of refusal to accept tender of payment would be barred as legally insufficient as a matter of law.

Thus, even though Plaintiff establishes its affirmative case under Counts I and II of its Complaint, the Court, if acting with subject matter jurisdiction, would have found that Defendants' affirmative defense of fraud (in terms of fraud in the factum) presents genuine issues of material fact that would have precluded summary judgment.

### E.

▇▇▇ Here, Defendants brought a Counterclaim against Plaintiff, alleging seven separate counts.[23] Based on the

---

**22.** Moreover, section 3–604 of the Massachusetts Commercial Code, M.G.L. c. 106 § 3–604, does not govern the instant case because it applies only to negotiable instruments. *See* M.G.L. c. 106 § 3–102(1)(e). Here, the Court finds as a matter of law that the First Note, which had a variable interest rate, is not a negotiable instrument. *See, e.g., FSLIC v. Griffin*, 935 F.2d 691, 697 n. 3 (5th Cir.1991); *New Connecticut Bank & Trust Co., N.A. v. Stadium Management Corp.*, 132 B.R. 205, 208–09 (D.Mass.1991). *Cf. FDIC v. Hershiser Signature Properties*, 777 F.Supp. 539, 542 (E.D.Mich.1991); *First City Federal Savings Bank v. Bhogaonker*, 715 F.Supp. 1216, 1219–20 (S.D.N.Y.1989). Defendants themselves assert that the Notes are nonnegotiable. *See* Defendants' Memorandum at 16.

Independent of the nonnegotiability of the First Note, section 3–604 applies only to a tender of full payment made when or after it is due. *See* M.G.L. c. 106 § 3–604(1). The First Note was not due on the date of the alleged tender. Therefore, this section of the Code is not applicable to the First Note.

**23.** Defendants do not argue their Counterclaim in their Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment.

The Court issued on March 7, 1991 an Order to Show Cause, ordering Defendants to show cause in a fact-specific writing why the Counterclaim asserted against the FDIC in this action should not be dismissed without prejudice pursuant to the provisions of 12 U.S.C. section 1821(d) pending exhaustion of the procedure

same analysis employed by the Court in concluding that it lacked subject matter jurisdiction over Defendants' affirmative defenses,[24] the Court similarly finds that it has no subject matter jurisdiction over Defendants' Counterclaim nor can *this Court* acquire jurisdiction over it in future. It must dismiss, without prejudice, the Counterclaim for lack of subject matter jurisdiction.[25] *See The Satter Companies,* slip op. at 5–6; *Farrah,* slip op. at 5. Again, however, in the interest of providing a complete record for dispositive appellate review, the Court will address the issues generated by Defendants' Counterclaim on this Motion for Summary Judgment as it would if persuaded that it had subject matter jurisdiction over the Counterclaim.

### F.

■ The *D'Oench, Duhme* doctrine operates to bar affirmative claims, as well as defenses, raised by parties against the FDIC. *See Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d 46, 49 (1st Cir.1991) ("[T]o distinguish between affirmative claims and defenses for purposes of applying the *D'Oench* doctrine would reduce the protection offered by the doctrine to a nullity.").

With respect to Count I of the Counterclaim (fraud), the Court, if acting with subject matter jurisdiction, would have found regarding Defendants' affirmative defense of fraud (in the inducement) that the *D'Oench, Duhme* doctrine and section 1823(e) bar such claims based upon fraud. *See Timberland Design,* 932 F.2d at 50

("To allow the plaintiff to assert tort claims based on the oral agreement would circumvent the very policy behind *D'Oench,* and therefore, *D'Oench* is generally said to apply to tort claims."). The Court, if acting with subject matter jurisdiction, however, also would have found that Defendants' affirmative defense of fraud in the factum presents genuine issues of material fact that would preclude summary judgment. Therefore, the Court, if acting with subject matter jurisdiction, would similarly find that Count I of the Counterclaim (in terms of fraud in the factum) would raise genuine issues of material fact that would preclude summary judgment.

■ With respect to Count II of the Counterclaim (Unfair and Deceptive Practices), under Massachusetts law, common law fraud can be the basis for a claim of unfair or deceptive practices under M.G.L. c. 93A. *See McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 714, 563 N.E.2d 188 (1990); *PMP Associates, Inc. v. Globe Newspaper Co.,* 366 Mass. 593, 596, 321 N.E.2d 915 (1975). Count II is predicated in part upon the existence of the same alleged oral representations that formed the factual predicate for Defendants' affirmative defense and Counterclaim count of fraud in the inducement, which the Court found was barred by the doctrine and section 1823(e). *See* Answer, Affirmative Defenses and Counterclaim, ¶¶ 16, 18. To the extent, however, that fraud in the factum forms a basis for Count II of the Counterclaim, it would sur-

---

for claims resolution by the FDIC established by 12 U.S.C. sections 1821(d)(3) and (5) and the regulations promulgated under 12 U.S.C. section 1821(d)(4).

On April 16, 1991, the Court endorsed Defendants' Order to Show Cause as follows:

Good cause having been shown and without objection, *see* Local Rule 19, the Counterclaim of Defendants herein are hereby *SEVERED* from this claim asserted in this complaint and the former are hereby *ASSIGNED* to the Suspense Docket pending further Order of Court. Docket No. 8. Thereafter, on October 22, 1991, the Court removed this case from its Suspense Docket and transferred it to the Court's active docket. *See* Docket No. 17.

**24.** *See supra* section III(C).

**25.** Under 12 U.S.C. § 1819(b)(2)(A):

Except as provided in subparagraph (D) [which is inapplicable here because BNE was a national, not a state, depository institution], all suits of a civil nature at common law or in equity to which the Corporation, in any capacity, is a party shall be deemed to arise under the laws of the United States.

Thus, this claim is governed by federal law. Under 12 U.S.C. § 1819(b)(2)(B), any case involving the FDIC as a party is removable to the federal court by the FDIC. The FDIC here has exercised the right of removal and is entitled to have the Counterclaim adjudicated in a federal court. Hence, the Court cannot remand the Counterclaim to the state court.

vive Plaintiff's Motion for Summary Judgment.

■ Moreover, in addition to alleged oral agreements, Defendants allege that Plaintiff's alleged unfair and deceptive practices included certain conduct, including its alleged failure to provide, upon request, Defendants with copies of the loan agreements and guaranties during and after the closing. Counterclaim, ¶ 18. The Court finds that this alleged conduct would present a genuine issue of material fact that must be resolved by the factfinder. Therefore, the Court, if acting with subject matter jurisdiction, would deny Plaintiff's Motion for Summary Judgment on Count II of the Counterclaim.

■ With respect to Count III of the Counterclaim (Breach of Implied Covenant of Good Faith), this claim is also predicated upon the same oral representations that formed the factual predicate for affirmative defenses and Counterclaim Counts that this Court has found to be barred by the *D'Oench, Duhme* doctrine and section 1823(e). Moreover, courts have held that claims based on a breach of implied covenant of good faith and fair dealing are barred as a matter of law by the doctrine and section 1823(e). *See Clay v. FDIC*, 934 F.2d 69, 72–73 (5th Cir.1991); *Mainland Savings Association v. Riverfront Association, Ltd.*, 872 F.2d 955, 956 (10th Cir.), *cert. denied*, 493 U.S. 890, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989); *Resolution Trust Corp. v. Colorado 126 Partnership*, 746 F.Supp. 35, 36–37 (D.Colo.1990); *FSLIC v. Locke*, 718 F.Supp. 573, 582 (W.D.Tex. 1989). The Court, if acting with subject matter jurisdiction, would find that Count III of the Counterclaim is similarly barred.

■ With respect to Count IV (Negligence) of the Counterclaim, Plaintiff brought no claim against Defendants on the Guaranties arising out of overdraft obligations of GBI. *See* Affidavit of Louis Bingham in Support of Plaintiff's Motion for Partial Summary Judgment, ¶ 24. Plaintiff's claims are based solely on the First, Second, Third, and Fourth Notes. The Court concludes that even if BNE negligently failed to honor check-stop-payment orders in February 1988, as alleged, (and then sought to induce Defendants to sign a fourth note to cover the overdraft), that negligence has no bearing on the instant case because any alleged oral representations by BNE to Defendants regarding the signing of the Fourth Note arising from such negligence are barred by the *D'Oench, Duhme* doctrine and section 1823(e). Therefore, no genuine issue of material fact would exist with respect to Count IV of the Counterclaim.

■ With respect to Count V of the Counterclaim (Negligent Infliction of Emotional Distress), physical harm is a prerequisite to recovery for the negligent infliction of emotional distress under Massachusetts law.[26] *See Cusic v. Commonwealth,*

---

**26.** The Court finds that both Counts V and VI of the Counterclaim are governed by Massachusetts law for the reasons that follow.

Unlike a case where jurisdiction is based upon diversity of citizenship, resulting in application of the choice-of-law rules of the forum state, *see, e.g., Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Holbrook v. Andersen Corp.*, 756 F.Supp. 34, 37 (D.Me.1991), where, as here, jurisdiction is based upon 12 U.S.C. section 1819, federal law governs such cases, and such law must supply the rule of decision. *See D'Oench, Duhme*, 315 U.S. at 455, 62 S.Ct. at 678. Courts may look either to federal common law or state law for guidance. *See FDIC v. Blue Rock Shopping Center*, 766 F.2d 744, 747 (3d Cir.), *American National Bank v. FDIC*, 710 F.2d 1528, 1534 n. 7 (11th Cir.1983).

Some courts have concluded that federal common law should supply the rule of decision. *See, e.g., FDIC v. Wood*, 758 F.2d 156, 159 (6th Cir.1985); *Santoni v. FDIC*, 677 F.2d 174, 178 (1st Cir.1982). *See also D'Oench, Duhme*, 315 U.S. at 467–69, 62 S.Ct. at 683–85 (Jackson, J., concurring). In reaching this conclusion, some of these courts have applied the test delineated in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), which is based on three factors, namely, first, whether the nature of the federal program requires national uniformity; second, whether the application of state law would frustrate specific objectives of the federal program; and third, whether the application of a federal rule would disrupt commercial relationships predicated on state law. *See id.* at 728–29, 99 S.Ct. at 1458–59. In applying federal common law, "federal courts are free to apply the traditional common law technique of decision and to draw upon all the sources of common law...." *American National Bank,* 710 F.2d at 1534 n. 7 (quoting *D'Oench,*

412 Mass. 291, 293, 588 N.E.2d 665 (1992); *Payton v. Abbott Labs*, 386 Mass. 540, 555–56, 437 N.E.2d 171 (1982). *See also Restatement (Second) of Torts* § 436(A) (1965) ("If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance."). Defendants have failed to show in the motion record that they suffered any physical injury or harm, arising from Plaintiff's alleged conduct. Therefore, the Court, if acting with subject matter jurisdiction, would find that, as a matter of law, Count V of the Counterclaim fails for lack of legal sufficiency.

Under Count VI of the Counterclaim (Intentional Infliction of Emotional Distress), Defendants must establish four elements for a cause of action, pursuant to Massachusetts law:

It must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community;" (3) that the actions of the defendant were the cause of the plaintiff's

315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring). *See also In re Crist*, 632 F.2d 1226, 1229 (5th Cir.1980) ("When disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy.") (citing 1A *Moore's Federal Practice* ¶ 0.325 (2d ed. 1979)), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981); *Quadrini v. Sikorsky Aircraft Division, United Aircraft Corp.*, 425 F.Supp. 81, 88 (D.Conn.1977) ("[W]hen a district court is, to a considerable extent, functioning as a state court, similar considerations do not justify permitting the accident of a particular local forum to determine choice of law rules in a federal question case.").

Courts have held that no federal common law exists regarding claims for infliction of emotional distress; rather, such claims are based on state common law. *See, e.g., Gillman v. Burlington Northern Railroad Co.*, 878 F.2d 1020, 1023 (7th Cir.1989) ("Because of the lack of federal common law on negligent infliction of emotional distress ... the district court [correctly] decided to apply Illinois law."); *McDermott v. Western Union Telegraph Co.*, 746 F.Supp. 1016, 1024 (E.D.Cal.1990) ("Defendant has cited a number of cases in support of its contention that ... claims for infliction of emotional distress are not cognizable under federal common law. Plaintiff ... fails to cite a single case showing that claims for emotional distress are cognizable under federal common law.") (citation omitted).

To determine which state's common law to apply, courts look to the law of the state where the alleged cause of action arose. *See, e.g., American National Bank*, 710 F.2d at 1534 n. 7 ("[W]e look to the law of Florida since the parties executed the escrow agreement in that State, and their reliance on Florida law in presenting this appeal demonstrates their intent to regulate and interpret the agreement under the laws of that State."); *In re Crist*, 632 F.2d at 1229 ("Numerous factors support the reference to Florida law. The Pinkertons were married in Florida, resided in Florida and were divorced in Florida. The ... agreements were all submitted to the Florida court for approval and inclusion in the Florida divorce decree."); *FDIC v. Alvarez Lau*, 681 F.Supp. 977, 979 (D.P.R.1988) ("In the instance of conjugal partnership liability, we are faced with no applicable federal standards and look instead to Puerto Rico law, under which the parties originally bound themselves."); *Quadrini*, 425 F.Supp. at 88 ("Those claims of the plaintiffs that sound in tort should be governed by the law of the place of the crash, the federal enclave in North Carolina.").

Where the FDIC is a party, however, "[s]tate law may not be used ... if its application would frustrate the federal interest in empowering the FDIC with the capacity to act as receiver for ... the assets of failed banks. Thus, when state law defenses would deny the FDIC recovery on promissory notes acquired from a failed bank, they have not been applied." *Alvarez Lau*, 681 F.Supp. at 979. *See also FDIC v. Tito Castro Construction, Inc.*, 548 F.Supp. 1224, 1226–27 (D.P.R.1982), *aff'd*, 741 F.2d 475 (1st Cir.1984).

Here, the Court finds that application of Massachusetts common law to Defendants' counterclaim for alleged infliction of emotional distress by Plaintiff will not frustrate the specific objectives of the FDIC. Therefore, the Court will turn to state common law to address Defendants' claims for infliction of emotional distress. In determining which state's common law to apply, the Court notes that this counterclaim count is based on conduct that occurred in Massachusetts, where the parties contracted. Therefore, the Court concludes that Massachusetts law pertaining to infliction of emotional distress should govern the Court's analysis of Counts V and VI of the Counterclaim. In this light, Plaintiff, without the specific guidance of the Court as provided herein, wrongly relied upon Maine law in its brief. *See* Plaintiff's Memorandum at 38–41.

distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976) (citations omitted). In *Agis,* the court held that the plaintiff made out a cause of action for intentional infliction of emotional distress and that her complaint was, therefore, legally sufficient. *Id.* at 145, 355 N.E.2d 315. It concluded that "[b]ecause reasonable men could differ on these issues, we believe that 'it is for the jury, subject to the control of the court,' to determine whether there should be liability in this case." *Id.* (footnote omitted).

Here, the Court similarly concludes that Defendants' claim under Count VI of the Counterclaim would be legally sufficient and would present genuine issues of material fact, independent of any oral agreements or representations that may be barred by the *D'Oench, Duhme* doctrine. *Cf. Godbout v. Cousens,* 396 Mass. 254, 264–65, 485 N.E.2d 940 (1985). Therefore, the Court, if acting with subject matter jurisdiction, would deny Plaintiff's Motion for Summary Judgment on Count VI of Defendants' Counterclaim.

Under Count VII of the Counterclaim (Punitive Damages), Defendants' claim would also fail. Punitive damages are not recoverable against the FDIC as a receiver of a failed institution absent congressional authorization. *See, e.g., FDIC v. Claycomb,* 945 F.2d 853, 861 (5th Cir. 1991); *Commerce Federal Savings Bank v. FDIC,* 872 F.2d 1240, 1248 (6th Cir.1989); *Torke v. FDIC,* 761 F.Supp. 754, 755 (D.Colo.1991); *Tuxedo Beach Club Corp. v. City Federal Savings Bank,* 749 F.Supp. 635, 650 (D.N.J.1990); *Royal Bank of Canada v. FDIC,* 733 F.Supp. 1091, 1099 (N.D.Tex.1990).

In sum, if the Court had subject matter jurisdiction over Defendants' Counterclaim, it would grant summary judgment in favor of the FDIC as Counterclaim Defendant on Counts III, IV, V, and VII of Defendants' Counterclaim, and it would deny summary judgment on Counts I, II, and VI of said

Counterclaim and set the case for trial only on the issues generated by those counts.

### IV. *Conclusion*

Accordingly, it is ORDERED that Plaintiff's Motion for Partial Summary Judgment on its Complaint be, and it is hereby, GRANTED as specifically stated above.

It is FURTHER ORDERED that Defendants' affirmative defenses and their Counterclaim herein be DISMISSED, without prejudice, for lack of subject matter jurisdiction over them.